**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

FILED
9/12/2022
Court of Appeals
Division I
State of Washington

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| JUSTIN L. OAKLEY, individually and on behalf of all those similarly situated, | No. 82659-0-I |
| Respondent, | |
| v. | ORDER GRANTING MOTION TO PUBLISH |
| DOMINO'S PIZZA LLC, a foreign limited liability company, | |
| Appellant. | |

Respondent Justin Oakley moved for publication of the opinion filed on August 15, 2022. Appellant Domino's Pizza LLC has filed an answer. A panel of the court has reconsidered its prior determination not to publish the opinion for the above entitled matter and has found that it is of precedential value and should be published.

Now, therefore it is hereby

ORDERED that the written opinion filed on August 15, 2022 shall be published and printed in the Washington Appellate Reports.

For the Court:

_____
Judge

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JUSTIN L. OAKLEY, individually and on behalf of all those similarly situated, | No. 82659-0-I |
| Respondent, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| DOMINO'S PIZZA LLC, a foreign limited liability company, | |
| Appellant. | |

SMITH, A.C.J. — Justin Oakley, a former delivery and service driver at the Domino's Pizza supply chain center in Kent, filed a class action complaint against Domino's for violations of the Washington Minimum Wage Act[1] and wage rebate act.[2] Domino's appeals the trial court's denial of its motion to compel arbitration under the parties' arbitration agreement. The court concluded that the agreement's choice of the Federal Arbitration Act[3] (FAA) as its governing law was ineffective because Oakley was excluded from the FAA's scope as a transportation worker engaged in interstate commerce, and that the agreement's choice of the FAA could not be severed from the agreement. We agree that the choice of the FAA is ineffective, but conclude that this provision is severable.

---

[1] RCW 49.46.

[2] RCW 49.52.

[3] 9 U.S.C. §§ 1-14.

Citations and pin cites are based on the Westlaw online version of the cited material.

No. 82659-0-I/2

Nonetheless, because we conclude that the arbitration agreement's class action waiver is unconscionable, we affirm the trial court's denial of the motion to compel arbitration.

FACTS

Justin Oakley worked as a Delivery and Service driver at the Domino's Pizza supply chain center in Kent from November 2018 to January 2020. The Kent supply chain center is part of the Domino's supply chain division, which consists of a "network of 19 domestic and 5 Canadian Supply Chain Centers, a vegetable processing facility, a pressed product plant, and an Equipment & Supply Center." The supply chain division supplies more than 225 types of products, such as dough balls, pizza toppings, napkins, and cleaning supplies, to 99 percent of Domino's stores, of which there are some 15,000 worldwide. While most of these supplies are brought to the supply chain centers and then perhaps reapportioned before being delivered to Domino's restaurants, the supply chain centers also create the dough balls for the restaurants from raw ingredients.

As a Class A driver,[4] Oakley drove a semi-truck with a refrigerated trailer on a multi-state route that usually included deliveries to Washington and Oregon and occasionally to Idaho, Montana, and Wyoming. Oakley's shifts all started and ended in Kent, and most of Oakley's deliveries were inside the state of

---

[4] Oakley was required to have a Class A Commercial Driver's License for his job.

2

No. 82659-0-I/3

Washington.[5]  Most Class A drivers "also routinely delivered supplies across state lines."

When Oakley began his employment, he signed an arbitration agreement. The agreement provided that disputes would be submitted to "binding arbitration under the Federal Arbitration Act," including disputes "relating to the scope, validity, or enforceability of this Arbitration Agreement."  The agreement also specified that disputes would "be arbitrated only on an individual basis and not on a class, collective, multi-party, or private attorney general basis."  It included a severability clause permitting the arbitrator or court to sever any term or provision deemed void, unenforceable, or in contravention of law, except that if the prohibition on class-wide actions was deemed invalid, then the entire arbitration agreement "shall be null and void."  The agreement included an opt-out provision permitting Oakley to opt out within 30 days of signing the agreement.  Oakley did not opt out.

On September 30, 2020, Oakley filed a class action complaint for damages, claiming that Domino's had violated the Washington Minimum Wage Act and wage rebate act.  Domino's removed the case to federal court based on diversity jurisdiction, but the federal court remanded the case to superior court on

_____

[5] Domino's submitted a declaration in the trial court contending that Oakley only "occasionally" travelled out-of-state and that he primarily delivered products inside Washington.  However, at oral argument, Domino's contended that this was not inconsistent with Oakley's claim that his routes "usually involved deliveries to Oregon," by explaining that "you could make deliveries at five Washington locations and one Oregon, and he'd still be correct that he might usually do that. . . . The bottom line is most of his deliveries were to Washington locations."

3

February 11, 2021.  Domino's then filed a motion to compel arbitration.  The

court denied the motion, concluding that Oakley was exempt from the FAA and

that the agreement's choice of the FAA could not be severed from the

agreement.  Domino's appeals.

ANALYSIS

"We review a trial court's decision to grant a motion to compel or deny

arbitration de novo."  Walters v. A.A.A. Waterproofing, Inc., 151 Wn. App. 316,

320, 211 P.3d 454 (2009).  "The party opposing arbitration bears the burden of

showing that the agreement is not enforceable."  Zuver v. Airtouch Commc'ns,

Inc., 153 Wn.2d 293, 302, 103 P.3d 753 (2004).

Jurisdiction

As an initial matter, Domino's contends that the court does not have the

authority to address this case because the arbitration agreement requires

referring any disputes "relating to the scope, validity, or enforceability" of the

agreement to arbitration.  We conclude that we have limited jurisdiction to hear

this case.[6]

Generally, "[c]ourts, not arbitrators, determine the threshold matter of

whether an arbitration clause is valid and enforceable."  Saleemi v. Doctor's

Assocs., Inc., 176 Wn.2d 368, 376, 292 P.3d 108 (2013).  However, under both

---

[6] Domino's raises this issue for the first time on appeal, but because it concerns our jurisdiction over the case, we address it under RAP 2.5(a)(1).  See Gorden v. Lloyd Ward & Assocs., PC, 180 Wn. App. 552, 563, 323 P.3d 1074 (2014) (court had subject matter jurisdiction to determine enforceability of arbitration agreement where issue had not been clearly and unmistakably delegated to the arbitrator).

federal and Washington law, questions about the validity of an arbitration question may be delegated to the arbitrator if the parties' agreement "clearly and unmistakably" provides that they should be. AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986); Hill v. Garda CL Nw., Inc., 179 Wn.2d 47, 53, 308 P.3d 635 (2013). Nonetheless, and notwithstanding such a delegation clause, the question of whether an arbitration agreement falls within the scope of the transportation worker exception of 9 U.S.C. § 1 is a question for the courts. New Prime Inc. v. Oliveira, 139 S. Ct. 532, 538, 202 L. Ed. 2d 536 (2019) ("[A] court may use §§ 3 and 4 to enforce a delegation clause only if . . . . the contract in which the clause appears doesn't trigger § 1's 'contracts of employment' exception."). See also 9 U.S.C. § 3 (court should stay proceedings and refer a case to arbitration only "upon being satisfied that the issue involved" in the case "is referable to arbitration").

Here, the arbitration agreement refers "any . . . dispute . . . relating to the scope, validity, or enforceability" of the agreement to binding arbitration. This is a clear and unmistakable delegation of these issues to the arbitrator. Tacoma Narrows Constructors v. Nippon Steel-Kawada Bridge, Inc., 138 Wn. App. 203, 215, 156 P.3d 293 (2007) (clause referring "all disputes" to arbitration did not clearly and unmistakably delegate issue of arbitrability to arbitrator); Raven Offshore Yacht, Shipping, LLP v. F.T. Holdings, LLC, 199 Wn. App. 534, 538, 541, 400 P.3d 347 (2017) (arbitration agreement's requirement that arbitration be conducted in accordance with Maritime Arbitration Association (MAA) rules,

5

which provide that arbitrator has jurisdiction over " 'any issues with respect to . . . the existence, scope or validity of the underlying arbitration agreement,' " was clear and unmistakable delegation of those issues to arbitrator (quoting MAA 9(a)). Notwithstanding this delegation, Oakley contends that he falls into the transportation worker exemption of the FAA, which is a question for the courts under New Prime.[7] 139 S. Ct. at 538. Therefore, we first address the applicability of the FAA.

<u>Applicability of the FAA</u>

Next, Domino's contends that the court erred by concluding that the FAA's transportation worker exception applied to Oakley's employment. We disagree.

The FAA provides that it does not "apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. In Circuit City Stores, Inc. v. Adams, the U.S. Supreme Court held that a narrow interpretation of this language was appropriate given "the location of the phrase 'any other class of workers engaged in . . . commerce' in a residual provision, after specific categories of [transportation] workers have been enumerated," and given the narrow meaning

---

[7] While the language in the FAA on which New Prime's holding relies focuses on federal courts, <u>see</u> 139 S. Ct. at 538; 9 U.S.C. §§ 3, 4, Congress did not intend "to limit the [FAA] to disputes subject only to *federal* court jurisdiction." <u>Southland Corp. v. Keating</u>, 465 U.S. 1, 15, 104 S. Ct. 852, 79 L. Ed. 2d 1 (1984). Other state courts have accordingly relied on New Prime for the proposition that they should determine whether a contract falls within the scope of the FAA before enforcing a delegation provision. <u>Theroff v. Dollar Tree Stores, Inc.</u>, 591 S.W.3d 432, 440 (Mo. 2020), reh'g denied (Jan. 30, 2020), aff'd (Jan. 14, 2020); <u>Smith v. HOVENSA, LLC</u>, 74 V.I. 57, 67 (Super. Ct. 2021); <u>Nelson v. Superior Court</u>, D075542, 2019 WL 5412107, at *4 (Cal. Ct. App. Oct. 23, 2019) (unpublished).

6

No. 82659-0-I/7

of the words "engaged in commerce" relative to "the more open-ended formulations 'affecting commerce' and 'involving commerce.' " 532 U.S. 105, 118, 121 S. Ct. 1302, 149 L. Ed. 2d 234 (2001) (alteration in original) (quoting 9 U.S.C. § 1). Accordingly, the Court concluded that this language "exempts from the FAA only contracts of employment of transportation workers." Circuit City, 532 U.S. at 119. More recently, the court held that "any class of workers directly involved in transporting goods across state or international borders" falls within this exemption. Sw. Airlines Co. v. Saxon, 142 S. Ct. 1783, 1789, 596 U.S. __ (2022).

The Circuit Courts have defined the test for whether an employee fits within the transportation exemption in various, generally complementary ways. "To determine whether a class of workers meets that definition, we consider whether the interstate movement of goods is a central part of the class members' job description." Wallace v. Grubhub Holdings, Inc., 970 F.3d 798, 801 (7th Cir. 2020).[8] "[T]o fall within the exemption, the workers must be connected not simply to the goods, but to the act of moving those goods across state or national borders." Wallace, 970 F.3d at 802 (Grubhub food delivery workers were not exempt from the FAA even though the food they delivered may have previously moved in interstate commerce; that interstate movement was not part of the transaction the workers were involved in); McWilliams v. Logicon, Inc., 143 F.3d

---

[8] See Home Ins. Co. of New York v. N. Pac. Ry. Co., 18 Wn.2d 798, 808, 140 P.2d 507 (1943) ("When a federal statute is construed by a United States Court of Appeals, such construction is entitled to great weight with us when the same statute is involved in a case we are considering, but it is not binding on us if we do not deem it logical or sound.").

7

No. 82659-0-I/8

573, 576 (10th Cir. 1998) (§ 1 exemption applies only to "employees actually engaged in the channels of foreign or interstate commerce.").  The Ninth Circuit recently held that the exemption applies to a "worker employed to deliver goods that originate out-of-state to an in-state destination" regardless of whether the worker personally travels between states, as long as the goods remain in the channel of interstate commerce.  Rittmann v. Amazon.com, Inc., 971 F.3d 904, 910 (9th Cir. 2020), cert. denied, 141 S. Ct. 1374, 209 L. Ed. 2d 121 (2021).  However, it held that the exception does not apply to workers, such as Uber drivers, whose work primarily consists of intrastate transportation but includes occasional, incidental, interstate trips that are not a " 'central part of the class members' job description.' "  Capriole v. Uber Techs., Inc., 7 F.4th 854, 864-65 (9th Cir. 2021) (quoting Wallace, 970 F.3d at 801).[9]

---

[9] The Eighth Circuit has also put forth several factors relevant to the determination of whether the transportation worker exemption applies:

> [F]irst, whether the employee works in the transportation industry; second, whether the employee is directly responsible for transporting the goods in interstate commerce; third, whether the employee handles goods that travel interstate; fourth, whether the employee supervises employees who are themselves transportation workers, such as truck drivers; fifth, whether, like seamen or railroad employees, the employee is within a class of employees for which special arbitration already existed when Congress enacted the FAA; sixth, whether the vehicle itself is vital to the commercial enterprise of the employer; seventh, whether a strike by the employee would disrupt interstate commerce; and eighth, the nexus that exists between the employee's job duties and the vehicle the employee uses in carrying out his duties (i.e., a truck driver whose only job is to deliver goods cannot perform his job without a truck).

Lenz v. Yellow Transp., Inc., 431 F.3d 348, 352 (8th Cir. 2005).  The Fifth Circuit declined to adopt this test on the grounds that it "unduly adds to the complexity of the analysis."  Eastus v. ISS Facility Servs., Inc., 960 F.3d 207, 211 (5th Cir.

In Rittmann, the court held that workers employed by Amazon.com to transport packages for the last mile of the shipment, from Amazon warehouses to their destination, were exempt from the FAA's application. 971 F.3d at 915. Even though the workers' journeys were generally intrastate, the packages generally traveled across state lines to get to the warehouses and "remain[ed] in the stream of interstate commerce until they [were] delivered." 971 F.3d at 915. The court distinguished A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 543, 55 S. Ct. 837, 79 L. Ed. 1570 (1935), in which the Supreme Court held that the slaughtering and sale of poultry by a slaughterhouse to local retail dealers and butchers were not "transactions in interstate commerce." Although the poultry was transported from other states, those interstate transactions ended when the poultry arrived at the slaughterhouse, and "flow in interstate commerce . . . ceased." Schechter Poultry, 295 U.S. at 543. The Rittmann court noted that the Amazon packages, by contrast, did not come to rest at Amazon warehouses, but instead the warehouses were "simply part of a process by which a delivery provider transfers the packages to a different vehicle for the last mile of the packages' interstate journeys." 971 F.3d at 916. Therefore, the workers fell within the § 1 exemption. See also Waithaka v. Amazon.com, Inc., 966 F.3d 10 (1st Cir. 2020), cert. denied, 141 S. Ct. 2886, 210 L. Ed. 2d 1001 (2021) (1st Circuit case also holding that Amazon "last mile" delivery drivers were exempt from FAA under § 1).

---

2020). While the parties did not brief these factors, it appears that most of them support Oakley's status as a transportation worker.

9

Here, Domino's employees such as Oakley are transportation workers within the meaning of 9 U.S.C. § 1 because they are "directly involved in transporting goods across state or international borders." Saxon, 142 S. Ct. at 1789. The transportation of goods from the Kent supply chain center to Domino's restaurants is the last step in a continuous channel of interstate transportation. Unlike the slaughterhouse in Schechter Poultry, the supply chain center does not mark the end of interstate transactions and the beginning of separate local transactions, but instead, as the name suggests, it is one stop in a larger supply chain. As the Domino's team member handbook describes it, "each Supply Chain facility *acts as a channel of support* for the stores it services." (Emphasis supplied.) Therefore, like an Amazon warehouse, the supply chain centers are "simply part of a process" by which Domino's supplies its stores. Rittmann, 971 F.3d at 916.

Moreover, even if Domino's products did exit interstate commerce when they arrived at the supply chain center, they would reenter interstate commerce when delivery drivers like Oakley transport them on interstate routes. While Domino's contends that Oakley "primarily delivered . . . supplies or products inside the state of Washington," it does not dispute that Oakley's routes "usually involved deliveries to Oregon" and that "most of the Class A drivers operating out of the Domino's Kent supply center also routinely delivered supplies across state lines." Unlike an Uber driver or local taxi driver, this interstate transportation appears to be a central part of the Class A delivery drivers' job descriptions. This fact substantiates the conclusion that delivery drivers in Oakley's position are

10

No. 82659-0-I/11

"actually engaged in the channels of foreign or interstate commerce."

McWilliams, 143 F.3d at 576; see also Wallace, 970 F.3d at 802 (determination

that "truckers who drive an interstate route" are members of a class engaged in

the movement of goods in interstate commerce is "easy to make").

Domino's attempts to liken its supply chain centers to the slaughterhouse

in Schechter Poultry, by emphasizing the reapportionment of goods and

production of dough from raw ingredients that takes place at the centers. But

these situations are not comparable. First, while the slaughterhouse was an

independent entity that purchased poultry from out-of-state producers and then

entered separate transactions with local purchasers, the supply chain centers are

merely one stop in the larger Domino's supply chain. Second, even if the supply

chain centers mark the end of an interstate transaction for the dough ingredients

and the beginning of subsequent transactions involving the dough itself, the

dough is only one of "more than 225 different types of products" provided by the

supply chain division. For the rest of those products, the supply chain center is

"simply part of a process" by which Domino's supplies its stores. Rittmann, 971

F.3d at 916.

Because Oakley is a transportation worker under 9 U.S.C. § 1, Oakley's

employment contract is exempted from the FAA.

## Severability and Choice of Law

Having concluded that Oakley's employment is exempt from the FAA, we

next consider whether the choice of the FAA is severable from the arbitration

agreement and whether a different law can govern arbitration instead. We

11

conclude that the reference to the FAA is severable and that Washington law governs the arbitration agreement.[10]

"Courts are generally loath to upset the terms of an agreement and strive to give effect to the intent of the parties." Zuver, 153 Wn.2d at 320. "Consequently, when parties have agreed to a severability clause in an arbitration agreement, courts often strike the offending . . . provisions to preserve the contract's essential term of arbitration." Id. However, where the offending provisions "permeate an agreement . . . such that severance would essentially require us to rewrite the dispute resolution agreement," we strike the entire agreement or section. McKee v. AT & T Corp., 164 Wn.2d 372, 402-03, 191 P.3d 845 (2008) (citations omitted) (concluding that four unconscionable terms tainted the entire dispute resolution section and that terms were therefore not severable); see also Zuver, 153 Wn.2d at 320 (concluding that there were only two unconscionable provisions which could easily be severed).

In Rittmann, the Ninth Circuit noted that it was not convinced the agreement's severability clause was triggered. 971 F.3d at 920 n.10. The

---

[10] Before reaching this question, it is worth returning first to the threshold question of this court's jurisdiction. As noted above, the arbitration agreement's clear delegation of disputes over the validity of the agreement, after resolution of the FAA question, is binding. However, the purpose of New Prime's requirement that courts verify whether § 1's exemption applies before compelling arbitration is to determine whether the court has the authority to stay litigation and compel arbitration under §§ 3 and 4 of the FAA. 139 S. Ct. at 538. Therefore, we reach the issue of severability because if the designation of the FAA is not severable, then the FAA would control and prevent this court from taking any further action. See, e.g., Arafa v. Health Express Corp., 243 N.J. 147, 155, 166, 233 A.3d 495 (2020) (addressing whether New Jersey arbitration law would apply to an agreement that was exempt from the FAA, despite arbitration agreement containing a delegation clause).

severability clause provided for severing "any provision . . . [that was] determined to be unenforceable." Id. at 908. The court stated that it "fail[ed] to see how the choice-of-FAA clause that Amazon drafted is unconscionable merely because the provision does not work as Amazon might have intended." Id. at 920 n.10. However, assuming that the severability clause did apply, the court ruled that the choice of the FAA was not severable: the agreement provided that "These Terms are governed by the law of the state of Washington without regard to its conflict of laws principles, except for Section 11 of this Agreement, which is governed by the Federal Arbitration Act and applicable federal law." Id. at 920. Excising the reference to the FAA would essentially rewrite the contract because the arbitration provision was treated expressly differently from the rest of the agreement. Id. The court also applied Washington law, noting that "[b]ecause it is not clear that the parties intended to apply Washington law to the arbitration provision in the event the FAA did not apply, we construe ambiguity in the contract against Amazon to avoid that result." Id.

Here, the arbitration agreement contains a severability clause providing for the severance or modification of any term or provision that is "declared void or unenforceable or deemed in contravention of law." In light of the foregoing discussion, we conclude that the agreement's requirement that disputes be "determined exclusively by binding arbitration under the Federal Arbitration Act" is unenforceable.[11] Therefore, we must determine whether the requirement that

---

[11] Oakley contends that, in accordance with the court's note in Rittmann, the severability clause is not triggered because the FAA provision is not void or unenforceable, but instead merely "leads to a conclusion Domino's does not like."

13

arbitration be "under the Federal Arbitration Act" is severable. We conclude that it is—unlike the choice-of-law provision in Rittmann, the agreement does not "expressly treat[ ] the arbitration provision differently."[12] 971 F.3d at 920. The choice of the FAA does not permeate the agreement such that severing the provision would require rewriting the agreement.

Having determined that the provision is severable, we next conclude that Washington law applies. "In the absence of an effective choice of law by the parties, the validity and effect of a contract are governed by the law of the state having the most significant relationship with the contract." Shanghai Commercial Bank Ltd. v. Chang, 189 Wn.2d 474, 484-85, 404 P.3d 62 (2017) (quoting Pac. Gamble Robinson Co. v. Lapp, 95 Wn.2d 341, 343, 622 P.2d 850 (1980)). The determination of which state has the most significant relationship turns on " '(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.' " Chang, 189 Wn.2d at 485 (quoting RESTATEMENT (SECOND) OF

We disagree. The Rittmann court's note that the choice of the FAA was not *unconscionable* failed to address the question of whether the choice of the FAA was *unenforceable*. 971 F.3d at 908, 920 n.10.

[12] Oakley cites various cases in which courts found that the FAA did not apply and either declined to address severability or found that state law could not apply before declining to compel arbitration; however, with the exception of Rittmann, none of these cases were applying Washington law. See W. Dairy Transp., LLC v. Vasquez, 457 S.W.3d 458, 467 (Tex. App. 2014); Ward v. Express Messenger Sys., Inc., 413 F. Supp. 3d 1079, 1087 (D. Colo. 2019); Hamrick v. Partsfleet, LLC, 411 F. Supp. 3d 1298, 1302 (M.D. Fla. 2019), rev'd in part, appeal dismissed in part, 1 F.4th 1337 (11th Cir. 2021); Gates v. TF Final Mile, LLC, 1:16-CV-0341-RWS, 2020 WL 2026987, at *7 (N.D. Ga. Apr. 27, 2020).

14

CONFLICT OF LAWS § 188). Although Domino's is a Michigan company, every other factor points toward Washington—Oakley is a Washington resident, Domino's does business in Washington, and Oakley's employment with Domino's was based in Washington. And both parties conceded at oral argument that there was no dispute that Washington is the state with the most significant relationship to the contract.[13] Therefore, we conclude that the contract is controlled by Washington law.

Unconscionability

Next, we apply Washington law to determine that the arbitration agreement is unconscionable.[14]

"An agreement that has a tendency 'to be against the public good, or to be injurious to the public' violates public policy." Scott v. Cingular Wireless, 160 Wn.2d 843, 851, 161 P.3d 1000 (2007) (internal quotation marks omitted) (quoting King v. Riveland, 125 Wn.2d 500, 511, 886 P.2d 160 (1994)). "An

---

[13] Domino's contended that the choice of law issue was a factual issue that should be addressed by the court on remand. But given the evidence in the record and the parties' agreement that Washington is the state with the most significant contacts, we conclude that we may make this determination on appeal. See, e.g., FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc., 180 Wn.2d 954, 966-70, 331 P.3d 29 (2014) (reversing trial court's dismissal of the case and reaching the issue of which state had the most significant relationship to the dispute).

[14] At oral argument, Domino's conceded—and Oakley urged—that this court could reach the issue of conscionability if we decided that Washington law applies. Wash. Ct. of Appeals oral argument, Oakley v. Domino's Pizza, LLC, No. 82659-0-I (Mar. 10, 2022) at 6 min., 22 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/watch/?eventID= 2022031073. Because the severability clause specifically provides that the entire arbitration agreement is void if the class action waiver is deemed invalid, we agree that it is appropriate for us to address the conscionability of the class action waiver.

agreement that violates public policy may be void and unenforceable." Scott, 160 Wn.2d at 851. "Like any other contract, an arbitration agreement may be substantively unconscionable when it is used as a tool of oppression to prevent vindication of small but widespread claims." McKee, 164 Wn.2d 372, 395, 191 P.3d 845 (2008). "[W]hen wrongs are small but widespread, class actions are often the only effective way to address them." McKee, 164 Wn.2d at 397.

Because "the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his or her freedom of labor," Washington public policy requires a worker to be "free from interference . . . in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protections."[15] RCW 49.32.020. While we need not address whether this statute specifically includes class actions as a concerted activity, class action suits uphold this same public policy. Our Supreme Court has noted in a different employment context that "[c]oncentrating . . . claims into one forum and certifying this class is likely the only way that the [employees'] rights will be vindicated" because individual employees "likely do not have the bargaining power to

---

[15] In a 2015 order, the National Labor Relations Board (NLRB) ordered Domino's to "[c]ease and desist from . . . [m]aintaining an Arbitration Agreement . . . that requires employees, as a condition of employment, to waive the right to maintain class or collective actions in all forums." Domino's Pizza, LLC & Fast Food Workers Comm., 363 NLRB 692, 693 (N.L.R.B. 2015). The NLRB found that this violated the National Labor Relations Act's prohibition on restraining employees' right to "engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. In 2018, however, the Supreme Court held that, contrary to the NLRB's interpretation, § 157 did not prohibit class action waivers in arbitration agreements that were controlled by the FAA. Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1624, 200 L. Ed. 2d 889 (2018). Ultimately, this issue is not before us because neither the FAA nor the NLRA are at issue here.

16

achieve systemic victories." Chavez v. Our Lady of Lourdes Hospital, 190 Wn.2d 507, 524, 415 P.3d 224 (2018). Moreover, " '[t]he Legislature has evidenced a strong policy in favor of payment of wages due employees by enacting a comprehensive scheme to ensure payment of wages' " in the Minimum Wage Act, creating a "substantive, nonnegotiable, statutorily-guaranteed right." Young v. Ferrellgas, LP, 106 Wn. App. 524, 531-32, 21 P.3d 334 (2001) (quoting Seattle Prof'l Eng'g Emps. Ass'n v. Boeing Co., 139 Wn.2d 824, 830, 991 P.2d 1126 (2000)). "Allowing an employment contract arbitration provision to replace this statutory cause of action would thwart public policy guaranteeing fair wages, codified by our Legislature." Id. at 532.

In this case, the record does not establish how extensive Oakley's claimed damages were, but it does indicate that Oakley would not have been able to pay a lawyer to bring the suit on an individual basis. Oakley's attorney noted that he generally does not take cases like this one, "with only smaller wage and hour claims against large entities like Domino's unless they can be filed on a class action basis," based on his experience that "handling smaller wage-only claims on an individual basis is not viable from a financial standpoint." Moreover, the prohibition on class actions may prevent Domino's employees from seeking restitution for Minimum Wage Act violations, even if they are able to afford a lawyer to represent them individually, because "individual [employees] may be reluctant to sue their employers." Chavez, 190 Wn.2d at 524. The class action waiver therefore frustrates our state's public policy of protecting workers' rights to

17

undertake collective actions and ensure the proper payment of wages. We are therefore persuaded that the class action waiver is substantively unconscionable.

Because the class action waiver is unenforceable, under the terms of the severability clause, the entire arbitration agreement is unenforceable.

Therefore, we affirm the trial court's denial of the motion to compel arbitration and remand for further proceedings.[16]

_Smith, A.C.J._

WE CONCUR:

_Coburn, J._

---

[16] Oakley makes a request for attorney fees on appeal to "preserve his right to recover" these fees at the conclusion of this case. Oakley will only be entitled to attorney fees under RCW 49.46.090, RCW 49.48.030, and RCW 49.52.070 if he ultimately prevails on the substantive issues in this case. Oakley does not cite any law establishing that his request at this stage is necessary to preserve his right to request fees later. Oakley will be eligible for fees if he ultimately prevails.